AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of California

| | | |
|---|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>ZTE Cellular Telephone; Model: Z832<br>IMEI: 86962702663872<br>S/N: 328C742104CB | )<br>)<br>)<br>)<br>) | Case No. 19MJ4295 |

FILED
OCT - 3 2019
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                              DEPUTY

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____Southern_____ District of _____California_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 952, 960 | Importation of Methamphetamine |

The application is based on these facts:

See attached affidavit of CBP Enforcement Officer Lisa M. Luna

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Lisa M. Luna, CBP Enforcement Officer
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 10/3/19

*Judge's signature*

City and state: San Diego, California         Hon. Michael S. Berg, United States Magistrate Judge
*Printed name and title*

# AFFIDAVIT

I, United States Customs and Border Protection (CBP) Enforcement Officer Lisa M. Luna, being duly sworn, hereby state as follows:

## INTRODUCTION

1. This affidavit supports an application for a warrant to search the following:

   **a.** ZTE Cellular Telephone
   Model: Z832
   IMEI: 86962702663872
   S/N: 328C742104CB
   (**Target Device**)

as described in Attachment A, and seize evidence of crimes, specifically, violations of Title 21, United States Code, Section(s) 952 and 960 – Importation of Controlled Substances. This search supports an investigation and prosecution of Alejandra Naranjo ("Defendant") for the crimes mentioned above. A factual explanation supporting probable cause follows.

2. The **Target Device** was seized on January 23, 2019, at the San Ysidro, California Port of Entry, in San Diego, California. The **Target Device** was seized from Alejandra NARANJO pursuant to her arrest for importation of federally controlled substances. The **Target Device** is currently stored as evidence at San Ysidro Port of Entry, Criminal Enforcement Unit, 720 E. San Ysidro Boulevard, San Diego, California 92154.

3. Based on the information below, there is probable cause to believe that a search of the **Target Device** will produce evidence of the aforementioned crimes, as described in Attachment B.

4. The information contained in this affidavit is based upon my experience and training, and consultation with other federal, state, and local law enforcement agents. The evidence and information contained herein was developed from interviews and my review of documents and evidence related to this case. Because this affidavit is made for the limited purpose of obtaining a search warrant for the

**Target Device**, it does not contain all of the information known by me or other federal agents regarding this investigation, but only contains those facts believed to be necessary to establish probable cause.

## EXPERIENCE AND TRAINING

5. I have been a CBP Officer since September 2000. As a CBP Officer, I am a Federal Law Enforcement Officer within the meaning of Rule 41(b) of the Federal Rules of Criminal Procedure, that is, a government agent engaged in the enforcement of the criminal laws of the United States, and thereby authorized to request issuance of federal search and seizure warrants.

6. I am a graduate of the CBP Officer academy at the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia, and the Advanced Training Center in Harpers Ferry, West Virginia. Part of this training included course studies in, among other things, criminal law, constitutional law, search and seizures, and courtroom procedure. As a result of my training and experience as a CBP Officer, I am familiar with federal criminal and immigration laws, and my primary duties have been the enforcement of those laws.

7. As an Enforcement Officer, my responsibilities include the investigation of possible violations of narcotics laws (Title 21, United States Code) and related offenses. As part of my assignments, I have interviewed countless of defendants and witnesses in drug smuggling investigations. Through my observations and these interviews, I have gained a working knowledge and insight into the operational habits of narcotics smugglers, with particular emphasis on those who attempt to smuggle illegal drugs into the United States from Mexico.

8. In preparing this affidavit, I have also conferred with other agents and law enforcement personnel who are experienced in the area of narcotics smuggling investigations, and the opinions stated below are shared by them. Further, I have personal knowledge of the facts below, or have had them related to me by persons mentioned in this affidavit.

9. Through the course of my training, investigations, and conversations with other law enforcement personnel, I am aware that it is a common practice for narcotics smugglers to work in concert with other individuals and to do so by utilizing cellular telephones to maintain communications with co-conspirators in order to further their criminal activities. This is particularly true in cases involving distributional quantities of hard narcotics, such as cocaine, heroin, and methamphetamine. Typically, load drivers smuggling narcotics across the border from Mexico into the United States are in telephonic contact with co-conspirators immediately prior to and following the crossing of the load vehicle, at which time they receive instructions on how to cross and where and when to deliver the controlled substances. Narcotics smugglers and their organizations use cellular telephones, in part, because these individuals believe law enforcement is unable to track the originating and destination phone numbers of calls placed to and from cellular telephones

10. Based upon my training and experience as a CBP Enforcement, and consultations with law enforcement officers experienced in narcotics smuggling investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

   a. Drug smugglers will use cellular/mobile telephones because they are mobile and they have instant access to telephone calls, text, web, and voice messages.

   b. Drug smugglers will use cellular/mobile telephones because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit.

   c. Drug smugglers and their accomplices will use cellular/mobile telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations.

   d. Drug smugglers will use cellular/mobile telephones to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo.

      e.    Drug smugglers will use cellular/mobile telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings.

      f.    Drug smugglers and their co-conspirators often use cellular/mobile telephones to communicate with load drivers who transport their narcotics and/or drug proceeds.

      g.    The use of cellular/mobile telephones by drug smugglers tends to generate evidence that is stored on the cellular/mobile telephones, including, but not limited to emails, text messages, photographs, audio files, call logs, address book entries, IP addresses, social network data, and location data.

    11.    Subscriber Identity Module (SIM) Cards, also known as subscriber identity modules, are smart cards that store data for cellular/mobile telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages. Much of the evidence generated by a smuggler's use of a cellular/mobile telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone.

    12.    Based upon my training and experience as a CBP Enforcement Officer, and consultations with law enforcement officers experienced in narcotics smuggling investigations, and all the facts and opinions set forth in this affidavit, I have learned that cellular/mobile telephones often contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, I have learned, based upon my training, education, and experience that searches of cellular/mobile telephones associated with narcotics smuggling investigations yield evidence:

    a.    tending to identify attempts to import methamphetamine or some other federally controlled substance from Mexico into the United States;

    b.    tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine or some other federally controlled substance from Mexico into the United States;

    c.    tending to identify co-conspirators, criminal associates, or others involved in the importation of methamphetamine or some other federally controlled substance from Mexico into the United States;

    d.    tending to identify travel to or presence at locations involved in the importation of methamphetamine or some other federally controlled substance from Mexico into the United States, such as stash houses, load houses, or delivery points;

    e.    tending to identify the user of, or persons with control over or access to, the cellular/mobile telephone; and/or

    f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

13.    On January 23, 2019, at approximately 4:45 a.m., Defendant Alejandra NARANJO, a United Sates citizen, applied for entry into the United States from Mexico at the San Ysidro, California Port of Entry pedestrian east facility. Upon inspection before a CBP Officer, Defendant stated she was a United States citizen, was going to Orange County, with nothing to declare from Mexico. The CBP Officer asked what her purpose was in Mexico and Defendant stated she was visiting her boyfriend who lives in Tijuana. The CBP Officer noticed the Defendant's voice become shaky. The CBP Officer inspected Defendant's bag and discovered a few unopened syringes. The CBP Officer referred Defendant to secondary for further inspection.

15.    In secondary, a Canine Enforcement Officer (CEO) was requested and the Human/Narcotic Detector Dog (HNDD) alerted to the Defendant's groin area.

1  Defendant was secured and escorted to the security office for further inspection. A
2  CBP Officer conducted a pat down and discovered a package concealed in the
3  Defendant's groin area. The package was probed and revealed a crystal-like
4  substance, which field-tested positive for the presence of methamphetamine. The
5  package had a net weight of approximately 217 grams (0.48 pounds) of
6  methamphetamine. Defendant was arrested and charged with violation of Title 21,
7  United States Code, 952 and 960, Unlawful Importation of a Controlled Substance.

8      15.    The **Target Device** was discovered and seized by CBP at the time of
9  Alejandra Naranjo's arrest. CBP assumed custody of the **Target Device**.

10     16.    Based upon my experience investigating narcotics traffickers and the
11  particular investigation in this case, I believe that Alejandra NARANJO likely used
12  the **Target Device** to coordinate the importation of federally controlled substances
13  into the United States. In addition, I believe that recent calls made and received,
14  telephone numbers, contact names, electronic mail (e-mail) addresses, appointment
15  dates, text messages, pictures and other digital information may be stored in the
16  memory of the **Target Device**, which may identify other persons involved in
17  narcotics trafficking activities. Accordingly, based upon my experience and training,
18  consultation with other law enforcement officers experienced in narcotics trafficking
19  investigations, and all the facts and opinions set forth in this affidavit, I believe that
20  information relevant to the narcotics smuggling activities of Alejandra NARANJO,
21  such as telephone numbers, made and received calls, contact names, electronic mail
22  (e-mail) addresses, appointment dates, messages, pictures, and other digital
23  information are stored in the memory of the **Target Device**.

24     17.    Finally, I also have learned that narcotics trafficking activities entail
25  intricate planning to successfully evade detection by law enforcement. In my
26  professional training, education and experience, I have learned that this requires
27  planning and coordination in the days, weeks, and often months prior to the event.
28

1  Given this, I request permission to search the **Target Device** for items listed in
2  Attachment B beginning on October 23, 2018, up to and including January 23, 2019.

## METHODOLOGY

18. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" or "airplane mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard-drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

19. Following the issuance of this warrant, I will collect the **Target Device** and subject it to analysis. All forensic analysis of the data contained within the **Target Device** and memory card(s) will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

20. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

## CONCLUSION

21. Based on all of the facts and circumstances described above, there is probable cause to conclude that Alejandra NARANJO used the **Target Device** to facilitate violations of Title 21, United States Code, Section(s) 952 and 960.

22. Because the **Target Device** was promptly seized during the investigation of NARANJO's smuggling activities and has been securely stored, there is probable cause to believe that evidence of illegal activities committed by NARANJO continues to exist on the **Target Device**. As stated above, I believe that the date range for this search is from October 23, 2018, up to and including January 23, 2019.

//
//
//
//
//
//
//
//
//
//
//
//
//

8

23. WHEREFORE, I request that the court issue a warrant authorizing law enforcement agents and/or other federal and state law enforcement officers to search the items described in Attachment A, and the seizure of items listed in Attachment B, using the methodology described above.

I swear the foregoing is true and correct to the best of my knowledge and belief.

Lisa M. Luna
CBP Enforcement Officer

Subscribed and sworn to before me this 3rd day of October, 2019.

HON. MICHAEL S. BERG
United States Magistrate Judge

9